UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| EDWARD SLADE, | Case No. 3:19-cv-00641-MMD-CLB |
|---|---|
| Petitioner, | ORDER |
| v. | |
| ISIDRO BACA, *et al.*, | |
| Respondents. | |

**I.   SUMMARY**

This is a habeas corpus action under 28 U.S.C. § 2254. Currently before the Court is Respondents' motion to dismiss. (ECF No. 19.) The parties agree that the action is untimely under 28 U.S.C. § 2244(d)(1). As further explained below, the Court finds that petitioner Edward Slade cannot demonstrate actual innocence to excuse the statute of limitations. The Court will thus grant the motion to dismiss.

**II.   BACKGROUND**

In August 1982, Slade shot and killed Karen Daniels. (ECF No. 20-8.) The state charged him with murder with the use of a deadly weapon.[1] (*Id.*) Murder is, relevant to Slade, the killing of a human being with malice aforethought. *See* NRS § 200.010(1). First-degree murder is, relevant to Slade, murder that is willful, deliberate, and premeditated. *See* NRS § 200.030(1)(a). At Slade's jury trial in January 1983, the state district court gave the following instruction regarding willfulness, deliberation, and premeditation:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.

---

[1]This type of charge, open murder, is a charge of first-degree murder which includes the lesser offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter. *See* NRS § 175.501; *Miner v. Lamb*, 464 P.2d 451, 453 (Nev. 1970).

> Premeditation need not be for a day, an hour, or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate, and premeditated murder.

(ECF No. 22-2 at 9 (Instruction No. 8).) This instruction has since become known as the *Kazalyn* instruction, after the name of the case in which the Nevada Supreme Court affirmed it. *See Kazalyn v. State*, 825 P.2d 578, 583 (Nev. 1992). The jury found Slade guilty of first-degree murder and set his sentence at life imprisonment without the possibility of parole. (ECF No. 22-8.) The Nevada Supreme Court dismissed his direct appeal on April 25, 1985. (ECF No. 23-4.)

On May 17, 2017, Slade filed a post-conviction habeas corpus petition in the state district court. (ECF No. 23-11.) The state district court determined that the petition was untimely under NRS § 34.726(1) and barred by laches under NRS § 34.800. (ECF No. 24-6.) The state district court also determined that Slade did not demonstrate good cause to excuse the procedural bars. (*Id.*) Slade appealed. The Nevada Court of Appeals affirmed. (ECF No. 24-9.)

Slade dispatched his initial habeas corpus petition under 28 U.S.C. § 2254 to this court on October 14, 2019. (ECF No. 7.)

### III.    LEGAL STANDARD

Slade's judgment of conviction became final in 1985. The one-year statute of limitations of 28 U.S.C. § 2244(d)(1)(A) was enacted on April 24, 1996. Slade thus had one year from that date, or up to and including April 24, 1997, to file a habeas corpus petition under 28 U.S.C. § 2254. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001).

Actual innocence can excuse operation of the statute of limitations. *See McQuiggin v. Perkins*, 569 U.S. 383, 386-87 (2013). "'[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no

2

juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Id.* at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

## IV. DISCUSSION

### A. Actual Innocence Under *Riley v. McDaniel*

#### 1. Relevant Legal History

The Ninth Circuit has held that, for the relevant time frame, Nevada has changed the law twice regarding the elements necessary to prove first-degree murder. First, between *Hern v. State*, 635 P.2d 278 (Nev. 1981) and *Powell v. State*, 832 P.2d 921 (Nev. 1992), Nevada treated willfulness, premeditation, and deliberation as three separate elements that the prosecution must prove beyond a reasonable doubt. *See Riley v. McDaniel*, 736 F.3d 719, 723 (9th Cir. 2015). Although Nevada law required the prosecution to *prove* these elements, Nevada law did not require the state district court to *define* these elements individually. This was the instruction given around the time of *Hern*:

> To constitute murder of the first degree there need be no considerable lapse of time between the formation of the felonious design to kill and the execution of the design. If a person has actually with malice aforethought formed the unlawful purpose to kill and has premeditated and deliberated upon it before he performs the act and then performs it in furtherance of said felonious design, he is guilty of murder of the first degree (,) however short the time may have been between the purpose and the execution. The intention to kill and the act of killing may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by and be the result of a concurrence of will, deliberation and premeditation on the part of the slayer, no matter how rapidly these acts of the mind succeed each other or how quickly they may be followed by the act of killing.

*Scott v. State*, 554 P.2d 735, 737 n. 2 (Nev. 1976), *cited with approval in Ogden v. State*, 607 P.2d 576 (Nev. 1980). In *Ogden*, the relevant issue was whether the *Scott* instruction failed to define premeditation and deliberation. *See* 607 P.2d at 578-79. The Nevada Supreme Court adopted the reasoning of *People v. Anderson*, 447 P.2d 942, 948 (Cal. 1968), which held that the California Legislature intended that premeditation and deliberation had only their ordinary dictionary meanings. *See* 607 P.2d at 579. Likewise, the Nevada Supreme Court held that nothing in the instruction in *Ogden* "indicate[d] that such words are used in law other than in their ordinary sense." *Id. Anderson*, in turn, held

3

that a "verdict of murder in the first degree on a theory of a willful, deliberate, and premeditated killing is proper only if the slayer killed as a result of careful thought and weighing of considerations; as a [d]eliberate judgment or plan; carried on coolly and steadily." *Riley*, 786 F.3d at 725 (quoting, with non-substantive omissions and alterations, *Anderson*, 447 P.2d at 948).

Second, between *Powell* and *Byford v. State*, 994 P.2d 700 (Nev. 2000), the Nevada Supreme Court not only approved of the *Kazalyn* instruction but also determined that the terms willfulness, premeditation, and deliberation were a single phrase meaning that the actor intended to commit the act and intended that death was the result. *See* 736 F.3d at 723-24 (internal citations cleaned up).

Third, in *Byford v. State*, 994 P.2d 700 (Nev. 2000), the Nevada Supreme Court concluded that the *Kazalyn* instruction confused premeditation and deliberation, underemphasizing the element of deliberation; subsequent reduction of the two elements to "intent" blurred and erased the distinction between first-degree murder and second-degree murder. *See* 736 F.3d at 724. The Nevada Supreme Court instructed state district courts to give the following instruction that defined deliberation:

> Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action.
>
> A deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill.

*Byford*, 994 P.2d at 714. This instruction did not exist in Nevada before *Byford*. The Nevada Supreme Court adopted that instruction from *State v. Brown*, 836 S.W.2d 530 (Tenn. 1992).

The Ninth Circuit concluded that it was a due-process violation to give the *Kazalyn* instruction to *Riley*, who was tried while *Hern* was the controlling law and before the decisions in *Kazalyn* and *Powell*. *See* 736 F.3d at 724. The Ninth Circuit also concluded that the error was not harmless. *See* 736 F.3d at 724-27.

4

Slade is in a different procedural position than *Riley*. The *Kazalyn* claim in *Riley* was timely. In contrast, Slade's petition is untimely. The issue before the Court is whether Slade can demonstrate actual innocence if the jury had received the *Scott* instruction at his trial.

### 2.     Relevant Evidence Presented at Trial

In August 1982, Karen Daniels, her sister Claire Daniels,[2] and Claire's three minor daughters, R.B., L.J. and D.S., lived in an apartment in Las Vegas, Nevada

On August 8, 1982, the night before the shooting, police were called to respond to a family disturbance at the same apartment. (ECF No. 22-1 at 66-67.) The police officer determined that Slade and Karen, whom the officer referred to as Karen Leavitt, had been fighting. (*Id.*) Nobody was arrested. (*Id.*)

On August 9, 1982, Slade and Debra Eaholtz drove to the Daniels' apartment. They went into Karen's bedroom. According to Eaholtz's testimony at trial, Karen used a knife to lock the door and keep out her sister. (ECF No. 21-1 at 232-33.) Eaholtz heard Karen and Slade start a friendly argument over Karen's ability to carry a gun. (*Id.* at 234-35.) Eaholtz looked toward them and saw them struggling over a gun. (*Id.* at 235-36.) Eaholtz tried to leave the room and could not because of the knife. One of Claire's daughters opened the door from the outside. Eaholtz then ran out of the room and simultaneously heard the gun discharge. (*Id.* at 236-37.) She left the apartment and then returned after finding that Slade's van was locked. She saw Slade on the phone and Claire repeatedly pushing on the cradle to disconnect the calls. Slade said that he was trying to call the ambulance. Claire said that Slade was trying to get away. Slade left the apartment. Eaholtz took the phone and started calling for an ambulance. Claire jerked the phone back and hit Eaholtz hard enough to cause a concussion and for Eaholtz to need stiches. (*Id.* at 238-39.)

///

---

[2] The Court will refer to the two sisters by their first names to avoid cumbersome repetition of their full names.

5

Eaholtz's statement to the police on the night of the killing was different. Karen Good, a homicide detective with the Las Vegas Metropolitan Police Department, testified about that statement:

> Just prior to the shooting, [Eaholtz] stated that Eddie [Slade] and Karen [Daniels] began to argue. She heard Karen say something about the Chicago Police Department or the Chicago Police and that Eddie was asking something about the money that Karen owed. She said she didn't know what money this was or any more about it than that. She said she was turned away from the two. She felt Eddie get up by the bed, turned around and saw Eddie standing next to Karen with the gun in his hand to her neck. That is when she left the room.

(*Id.* at 6-7.) Good also related that Eaholtz never said anything about Slade and Karen struggling. (*Id.* at 7.) Eaholtz did say that she saw Slade with a brown bag in the van prior to going into the apartment, and that Slade brought the bag into the apartment.[3] (*Id.*)

Claire was asleep on the sofa in the living room. Her daughters' screaming woke her up. (*Id.* at 75-76). Claire went into Karen's bedroom. She saw Slade bending over Karen. His left hand was full of blood, and he was wiping that hand on the wall. His right hand was on the side of the bed. (*Id.* at 77.) Slade walked out of the bedroom and went to the phone. (*Id.* at 78.) Slade said, "I only shot her on the side of the head." (*Id.* at 80.) Claire's daughters, R.B., L.J., and D.S., all testified that Slade made similar remarks that minimized the severity of what he had done. (*Id.* at 107, 131, 152.) Slade also said that he was calling for help. Claire did not trust that he was calling for help, and she disconnected the call by pushing down on the cradle. She then grabbed at Slade, and he ran away. Claire then called for the police. (*Id.* at 80). Eaholtz was present at this time. Eaholtz tried to leave, and Claire hit her with the phone's receiver hard enough to break the receiver. (*Id.* at 81.) When Slade was running away, Claire saw that he was carrying a brown bag. (*Id.* at 81-82.)

Slade testified that he and Karen struggled over a revolver and that the revolver went off while still in Karen's hand. (*Id.* at 196-98.)

---

[3] Testimony indicates that this was a satchel with a shoulder strap, not a brown paper bag.

6

However, the medical examiner testified that the bullet wound was two inches behind Karen's left ear. (*Id.* at 27.) Smoke marks around the wound indicated that the muzzle of the revolver was touching Karen's skin. (*Id.* at 31.) Smoke marks on Karen's left hand indicated that she was gripping the cylinder of the revolver with her left hand, and that when the gun fired smoke escaping from the gap between the chamber and the forcing cone was deposited on her hand. (*Id.* at 30.) It would have been very difficult for Karen to shoot herself where she did with her right hand. (*Id.* at 28-29.)

Slade went to a nearby convenience store. The night manager saw Slade speaking on the pay phone outside of the store. Slade entered the store and asked how long it would take for a taxi to arrive. Slade set his bag underneath the seat of a table, got a soft drink, and paid for it. Then Slade went back to his bag, went through it, and pushed it back under the seat. Slade went to the video game machines. Slade never said that someone had been shot or that an ambulance was needed. His demeanor was calm. (*Id.* at 22-25.)

Police officers soon found and arrested Slade at the convenience store. They observed nothing unusual with Slade's demeanor or composure. (*Id.* at 63-65, 72.)

After the police arrested Slade, a taxicab arrived at the convenience store. The driver entered the store and asked for the person who called for a taxi. The manager said that the police had arrested that man. The manager assumed that Slade was the one who called for a taxi because Slade was the only person who had used the pay phone around that time and then asked how much time it would take for a taxi to arrive. (*Id.* at 29-31.)

### 3. **Slade's Actual Innocence**

The Court first concludes that Slade killed Karen. Based upon his statements to Claire and her daughters, as well as the difficult-to-impossible contortions required for Karen to shoot herself where she was shot in the head, no reasonable juror would have reasonable doubt that Slade killed Karen. By the time of Slade's appeal from the denial of his state post-conviction petition, he argued, "[t]he evidence was not so great that it precluded a verdict of second-degree murder." (ECF No. 23-32 at 34.) This is not a concession *per se*, but it does acknowledge the strength of the evidence against him.

The issue is whether Slade acted with the deliberation necessary to be guilty of first-degree murder, in accordance with the *Scott* instruction. Circumstantial evidence introduced at trial show that Slade acted with deliberation. First, Slade and Karen fought the night before he killed her. Second, according to Eaholtz's statement to the police, no struggle occurred between Slade and Karen. Third, Slade produced the gun and put the muzzle against Karen's head. Karen grabbed the cylinder with her left hand. Nevertheless, Slade pulled the trigger and shot Karen. Fourth, Slade told the other people in the apartment that it was not a big problem, and when they did not believe him, he fled. Fifth, at the convenience store, he did not call for an ambulance, but he did call for a taxi. Sixth, the manager of the convenience store and the arresting police officers all noted that Slade had a calm demeanor. To sum it up, Slade, "carried on coolly and steadily." *Anderson*, 447 P.2d at 948. The Court cannot say that no reasonable juror would have found Slade guilty of first-degree murder beyond a reasonable doubt.

### B. *Byford* is Not Retroactive

The Nevada Supreme Court was asked whether *Riley* would be good cause to excuse the state-law procedural bars for untimely and successive petitions. The Nevada Supreme Court stated:

> [W]e . . . conclude that the district court did not err by denying Leavitt's petition because we do not agree with *Riley* and therefore it would not provide good cause. *See Nika v. State*, 198 P.3d 839, 851 (Nev. 2008) (discussing the history of Nevada law on the phrase "willful, deliberate, and premeditated," including *Hern v. State*, 635 P.2d 278 (Nev. 1981), and explaining that prior to *Byford* this court had not required separate definitions of the terms and had instead viewed them as together conveying a meaning that was sufficiently described by the definition of "premeditation" eventually approved in *Kazalyn* and *Powell*).

*Leavitt v. State*, 386 P.3d 620, 620-21 (Nev. 2016) (citations modified). *Leavitt* seems to indicate that before *Byford* premeditation and deliberation always were synonymous elements, or at least that the development of Nevada law before *Byford* did not have the distinct, abrupt changes that *Riley* describes. Slade proposes an alternative argument in case the Court finds that *Riley* is inapplicable to his case: *Byford* must apply retroactively.

8

The Court has applied *Riley* and determined that Slade cannot demonstrate actual innocence. Nonetheless, the Court will address and reject Slade's alternative argument.

*Byford* was a change in Nevada law. Before *Byford*, state district courts did not need to provide individual definitions for deliberation and premeditation. After *Byford*, they did. *See Nika v. State*, 198 P.3d 834, 849 (Nev. 2008). The Nevada Supreme Court noted that the Constitution did not require that change; it was a matter of the Nevada Supreme Court re-interpreting Nevada law. *See Nika*, 198 P.3d at 850. The Nevada Supreme Court noted that different jurisdictions have different treatments of "willful," "premeditated," and "deliberate;" some states treat the terms as synonymous, and other states treat the terms distinctly. *Nika*, 198 P.3d at 850-51. To that, this Court can add that Louisiana, which derives its statutes from European civil law and not English common law, does not even use those elements for murder. There, murder is a killing of a human being done with the specific intent to kill or to inflict great bodily harm. La. Rev. Stat. Ann. §§ 14:30, 14:30.1.[4] If that seems similar, it is because it is the rule that *Powell* adopted. "[T]he terms premeditated, deliberate and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death as the result of the act." *Greene v. State*, 931 P.2d 54, 61 (Nev. 1997) (citing *Powell*, 838 P.2d at 927). If it is constitutional for Louisiana to have those elements for murder, then Nevada's adoption of and recession from those elements is not a matter of constitutional concern.

*Byford* did have one constitutional difficulty. The Nevada Supreme Court initially ruled that *Byford* applied only to trials proceeding after the date of *Byford*'s decision; in other words, *Byford* would not apply to a person whose first-degree murder conviction was on direct appeal at the time. This ran afoul of the due-process principle that a new decision applies to convictions that are not yet final. The Nevada Supreme Court acknowledged that and held that *Byford* applies to convictions that were not yet final at the time of the

---

[4]Louisiana has degrees of murder, but they do not match Nevada's degrees of murder.

9

*Byford* decision. *See Nika*, 198 P.3d at 849-50. Slade cannot avail himself of this holding because his judgment of conviction became final before *Byford*.

Slade argues that two recent decisions of the Supreme Court, *Montgomery v. Louisiana*, 577 U.S. 190 (2016), and *Welch v. United States*, 578 U.S. 120, 136 S. Ct. 1257 (2016), require *Byford* to be applied retroactively. The Supreme Court has recently summarized its standards for retroactive application of new rules of constitutional law:

> New substantive rules alter "the range of conduct or the class of persons that the law punishes." [*Schriro v. Summerlin*, 542 U.S. 348, 353 (2004).] Those new substantive rules apply to cases pending in trial courts and on direct review, and they also apply retroactively on federal collateral review. New procedural rules alter "only the manner of determining the defendant's culpability." *Ibid.* (emphasis deleted). Those new procedural rules apply to cases pending in trial courts and on direct review. But new procedural rules do not apply retroactively on federal collateral review.

*Edwards v. Vannoy*, 141 S. Ct. 1547, 1562 (2021). Slade argues that *Byford* is a new substantive rule, and thus it must be applied retroactively on federal collateral review. (ECF No. 31 at 19-20.) Slade cites *Welch* in support of this argument, and *Welch* in turn uses the same quotation from *Summerlin* that *Edwards* uses.

The Supreme Court's retroactivity cases at issue relevant to this action all have one common thread: They all involve new *constitutional* rules of criminal procedure. In *Edwards*, the issue was whether the new constitutional rule that a jury must be unanimous to find a defendant guilty, *see Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), applied retroactively. In *Welch*, the issue was whether the new constitutional rule that the residual clause of the Armed Career Criminal Act was too vague to be valid, *see Johnson v. United States*, 576 U.S 591 (2015), applied retroactively. In *Montgomery*, the issue was whether the new constitutional rule barring mandatory sentences of life imprisonment without the possibility of parole for juvenile offenders, *see Miller v. Alabama*, 567 U.S. 460 (2012), required retroactive application in state post-conviction proceedings. In *Summerlin*, the issue was whether the new constitutional rule that a sentencing judge, without a jury, may not find an aggravating circumstance necessary for imposition of the death penalty, *see Ring v. Arizona*, 536 U.S. 584 (2002), applied retroactively. Finally, in the case that started

it all, *Teague v. Lane*, 489 U.S. 288 (1989), the issue was whether the new constitutional rule establishing how to prove racially discriminatory peremptory challenges of prospective jurors, *see Batson v. Kentucky*, 476 U.S. 79 (1986), applied retroactively. In some cases, the Court held that the new rule was substantive and applied retroactively. In other cases, the Court held that the new rule was procedural and did not apply retroactively. In *all* cases, the new rules of criminal procedure were rules of *constitutional* law; *i.e.*, the Constitution of the United States, as interpreted by the Court, directed the result.

Slade's argument interprets *Montgomery* and *Welch* too expansively. He writes:

> Thus, under *Welch*, courts must retroactively apply decisions with substantive functions, including decisions that narrow the scope of a criminal statute through statutory interpretation. And under *Montgomery*, state courts are bound to apply that rule. These decisions have invalidated the Nevada Supreme Court's approach to statutory interpretation cases. States may no longer avoid applying statutory interpretation decisions retroactively by calling them "changes."

(ECF No. 31 at 20.) For Slade's argument to be sound, one or both of the following must be correct. First, *Byford* would need to be a new substantive rule of constitutional law, and thus it must apply retroactively. As the Court has explained above, *Byford* is not a rule of constitutional law; no provision of the Constitution of the United States requires states to have particular elements for, as Nevada defines it, first-degree murder. Second, *Welch* would require, as a matter of constitutional law, a state court to apply a new substantive rule of criminal procedure retroactively, regardless whether the new substantive rule is a rule of constitutional law. *Welch* also would require *Byford* to be a new substantive rule. Slade's unstated assumption is that the Court's phrases "new substantive rule" and "new procedural rule" in *Montgomery* and *Welch*, without use of the word "constitutional," has expanded *Teague* from new substantive rules of constitutional law to new substantive rules in general. Both *Montgomery* and *Welch*, along with the other relevant cases that the court has described above, involved new *constitutional* rules of criminal procedure. Both *Montgomery* and *Welch* start their analyses by noting that under *Teague*, a new *constitutional* rule of criminal procedure generally does not apply retroactively, with exceptions. *See Welch*, 136 S. Ct. at 1264, *Montgomery*, 577 U.S. at 198. The later

absence of the word "constitutional" in *Welch* and *Montgomery* was not a secret extension of *Teague* to non-constitutional changes in state laws, because in *Welch* and *Montgomery* the rules at issue were rules of constitutional law. Nothing in *Montgomery* or *Welch* indicates that the Court was expanding *Teague* to state-court non-constitutional interpretations of state laws.

The Ninth Circuit appears to agree. Two other Nevada prisoners convicted of first-degree murder have used the same argument in their applications for leave to file second or successive petitions under 28 U.S.C. § 2244(b). The Ninth Circuit rejected those arguments, stating, "The Supreme Court cases on which he relies, *Montgomery v. Louisiana* and *Welch v. United States*, do not require retroactive application of a change in state law, like that adopted by the Nevada Supreme Court in *Byford v. State*, to cases on collateral review." *Palovich v. Gentry*, 794 Fed. App'x 577, 578 (9th Cir. Nov. 14, 2019). *See also Berry v. Williams*, 784 Fed. App'x 557 (9th Cir. Nov. 14, 2019).

Consequently, *Byford* does not apply retroactively to Slade.

### C.  Certificate of Appealability

To appeal the denial of a petition for a writ of habeas corpus, Petitioner must obtain a certificate of appealability, after making a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

Slade states at least one valid claim of the denial of a constitutional right. *Riley v. McDaniel* held that the use of the *Kazalyn* instruction at the time that Nevada had three distinct elements of willfulness, premeditation, and deliberation is a violation of due process. Ground One of Slade's amended petition is a *Riley* claim. Slade thus meets the first part of the standard for issuance of a certificate of appealability.

The Court ruled that Slade was not actually innocent because, even if the jury had received the instruction on premeditation and deliberation that the Nevada Supreme Court had approved before his trial, the evidence of Slade's behavior showed that he was acting with deliberation. Thus, it was less likely than not that no reasonable juror would have found Slade guilty of first-degree murder beyond a reasonable doubt. Reasonable jurists can debate this point, and the Court will grant a certificate of appealability on whether Slade is actually innocent.

The Court ruled in the alternative that *Montgomery v. Louisiana* and *Welch v. United States* do not require the retroactive application of *Byford*. The Court will deny a certificate of appealability on this issue. The Ninth Circuit has considered the same issue and has come to the same conclusion. There appears to be no debate among jurists of reason on this issue.

**V.     CONCLUSION**

It is therefore ordered that Respondents' motion to dismiss (ECF No. 19) is granted. This action is dismissed with prejudice because it is untimely. The Clerk of Court is directed to enter judgment accordingly and close this case.

///

///

///

///

///

///

///

It is further ordered that a certificate of appealability is granted on the following issues: (1) whether, due to an instructional error, Petitioner can be actually innocent of first-degree murder but guilty of second-degree murder, and (2) whether Petitioner is actually innocent.

DATED THIS 29th Day of September 2021.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE